The Court should reverse and enter judgment for Freightliner in this case, or in the alternative, grant a new trial or at least a remit of $7.7 million in future non-economic damages. Let me begin with the reverse and render point. The jury's only determination of defect in this case was based on California's consumer expectations test. And that test is pursuant to the Supreme Court of California's Sewell decision, very rarely applied and reserved for those cases where the defect claim could be resolved by the everyday experiences of the jury. And where no expert testimony is needed. And in fact, in the Sewell case, the Court said no expert testimony was allowed in a consumer expectations case. Here, this case simply does not meet that test. As the Court is aware, this was an extraordinary accident involving a fiery crash of a tractor-trailer, a semi-truck. And the theory of the case was that in addition to the six exit portals, the windows and the doors in the tractor-trailer, there should have been either a wider skylight that was openable, or another door in the sleeper compartment, which was right behind, in the same cab, right behind the driver's compartment. That, we respectfully submit, is not the kind of everyday experience of defect inquiry that would qualify under the consumer expectations test as a matter of law. And therefore, we believe the Court should reverse and render on that point alone. And just to give the Court an example, in the Sewell case, the California Supreme Court gave examples of the kind of defect claims that would qualify under this test. And it was the reciprocal type of defect claim, where someone buys their car and drives out of the lot, brand new car, pulls up at a red light, and the car explodes. Where everyone could say, cars are not supposed to do that. Or it rolls over in a two-mile-an-hour crash. Again, don't even have to inquire as to the type of defect. It's so obvious that anyone would be able to make a determination as to whether it's defective. In this type of complicated matter, where the question was how much safety is going to be achieved by adding an exit portal across the board in different accidents, that's the type of case that goes to the risk utility balancing test, which is the alternative test in California. The jury made no finding under the risk utility test. It was on the verdict form, but the jury was not required to answer that if it answered the consumer expectations test. The one final point on the Sewell decision, the Court noted, and I think this is important for this case, that ordinary consumers of automobiles quote, simply have no idea how it should perform in all foreseeable situations or how safe it should be against all foreseeable hazards. I think that just as a matter of law means this verdict must be overturned and judgment entered for Freightliner. The second point related to that is plaintiffs also have a negligence claim. And this Court's decision in the Papike case, which we cite, holds that if a plaintiff fails to prove defect, then their negligence claim is automatically barred because it's a necessary prerequisite to the negligence claim to show defect. The second point goes to the new trial, and that really goes, the crucial point is causation. The heart of this case was, once we get past the defect point, was whether Mr. Tillman would have been able to escape the burning vehicle had there been these extra exit portals. And as Plaintiffs' Counsel said during his opening argument, his opening statement, his closing statement, and emphasized throughout the trial, the crucial witness, in fact, the only witness in the case, was Mr. Harville, who was another truck driver who made a valiant effort to rescue Mr. Tillman. And Mr. Harville gave a deposition early on in the case and before Plaintiffs' theories had really developed. And unfortunately, he then was diagnosed with cancer and wasn't able to be at the trial. Freightliner asked to redepose him, and the judge declined that. So all that was available at trial with this crucial witness was his deposition testimony from early in the case. And in that testimony, he gave testimony that he saw Mr. Tillman standing there in the cab, and that if he had been able to pull him out of the burning vehicle, they would have walked up the hill together. And he made other statements that suggested that Mr. Tillman had the use of his legs and that Mr. Tillman said he was all right. Plaintiffs' counsel then used that testimony in the trial to argue that, for example, in the opening statement, the evidence will show from Mike Harville that Tim Tillman was able to use his legs. This man did not have injured legs. That's on Excerpts of Record, page 86. So it was a crucial issue, because if he didn't have use of his legs, that would have explained why Mr. Harville was not able to pull him out because he wasn't getting any assistance. Mr. Tillman was a very large man, 70 pounds or so heavier than Mr. Harville. Mr. Harville also in his deposition testified that Mr. Tillman had gotten stuck in the skylight, and that was crucial because Freightliner put on videotaped evidence, demonstrative evidence, which we lodged with the court, Exhibits 105 and 106, that showed that very large men could get up and slip right through the skylight and escape through the same skylight opening that was in this vehicle. So the theory was, though, that Mr. Tillman had gotten stuck, and that's what Mr. Harville testified to in his deposition. That was played for the jury. The statements that were gathered after that deposition by an investigator for Freightliner had Mr. Harville saying that he did not see whether Mr. Tillman could use his legs. He didn't know if Mr. Tillman could stand or if he was standing, and he didn't know if Mr. Tillman had gotten stuck right to the core of the case. The district court erred in excluding that evidence, and at first the district court was going to allow it and then decided that those statements were not sufficiently inconsistent with what Mr. Harville had testified. How were they inconsistent? Well, Your Honor, for two reasons. One, Mr. Harville's testimony in his deposition was that Mr. Tillman could walk and that he had use of his legs and that he was standing. In his statement to the investigator, he said he didn't know if Mr. Tillman could use his legs, that he didn't see his legs, and that's directly inconsistent. I looked at this and I thought if I were cross-examining Mr. Harville after he gave his testimony that he saw Mr. Tillman standing there, they would have walked up the hill together. I would have said, well, isn't it true? Where in the deposition testimony did Mr. Harville testify that Mr. Tillman was using his legs? There are several places that he says things that clearly indicate that he viewed him as having use of his legs. On page, excerpts of record, Your Honor, page 13, he says, I knew Tillman was standing there. He also says on page 27, if we could have gotten Tillman out of the cab, I believe we would have walked up the hill together. That's on page 27. On page 23, he says, we were face-to-face, like he was bending down to look through the window, and I was standing up, of course. Bending down doesn't necessarily imply use of the legs. But it at least implies that he was standing. And plaintiff's lawyer then said in his opening, was allowed to argue the inference from that testimony, he said, this is a direct quote from page 86, the evidence will show from Mike Harville that Tim Tillman was able to use his legs. He was there bending over, bending over at a point in time, and then we see him completely over crawling out. Was there someone representing Freightliner at this deposition? Yes. And so there was an opportunity to cross-examine, to flesh out, to clarify the extent of which Mr. Tillman was using his legs? Your Honor, it was very early in the case, and the defect theory of the plaintiff at the time was, I think, more focused on the defect in the fuel tank or some other type of defect. It wasn't until much later that this theory of the need for another exit portal was developed, and this causation issue became crucial. And therefore, under Rule 806, even if Freightliner would have had the opportunity to ask these questions, these were inconsistent statements that under Rule 806 were clearly admissible. They'd have to be fairly inconsistent. I mean, you did not have to reach to find an inconsistency, which is kind of close in this case. Your Honor, I think it's ‑‑ I keep putting myself back in the situation of a trial lawyer, and if I had a witness on the stand, let's assume Mr. Harville actually took the stand and he said these things, and the plaintiff, that he saw him, he was bending over, he was standing there, we would have walked up the hill together. I would have gotten up and I would have used those inconsistent statements and I would have said, well, you never saw his legs, did you? You don't know if he was standing. You don't know if he was able to push himself out of the vehicle using his legs, do you? And when Mr. Harville, if he had testified as he did in his deposition, Mr. Tillman was stuck, I would have then said, well, you admit, you later admitted you don't know if he was stuck. And that would have been crucial, Your Honor, that testimony from Mr. Harville was the centerpiece of the plaintiff's case that if the width had just been a little bit wider in the skylight, Mr. Tillman would have been able to just walk out. And so that went to the core of the case, and maybe the jury still would have rejected it, but when we're talking about impeaching a witness, that's clearly enough for inconsistency. I think that the district judge, if this had happened in court, would have let the testimony in. He had a different consideration whether to allow, in the light of Mr. Harville's health, whether or not to allow a deposition, him to be re-deposed. So it was a different thing than the witness actually being in court and being subject to cross-examination. The district court had a different consideration. That's right, Your Honor. I think that supports our argument, that Freightliner should have had greater latitude to use whatever it could to impeach that testimony. This was double hearsay in some respects, because Mr. Harville's deposition testimony was in part what Mr. Tillman told him in the burning vehicle. And so under these circumstances, Rule 806 specifically contemplates that whatever could have been used in court as an inconsistent statement could be used to impeach a declarant who is not in court. But the court in ruling on discovery disputes, the district court has very broad discretion, and the district court was in a better position to know what was appropriate in this case in view of the health of the deponent. That was part of the consideration, I thought. That's as to the deposition, Your Honor. And we think that the deposition should have been allowed to be retaken. But putting that aside, even if the court, as you say, was within discretion to not allow the redeposition, that doesn't have any effect on whether we can use these inconsistent statements. There's no – Well, the hearsay inconsistent statements. From an investigator, you mean? Yes. Yes, Your Honor. That's a different consideration. Yes. And that's really what I want to focus on, is that as in any case, if I come up with inconsistent statements from a witness, whether or not I could have elicited them in the deposition, and sometimes, as you know, a lawyer doesn't want to elicit the inconsistent statements in the deposition, because they want to surprise the witness and prove that they're not – their recollection is not accurate. And so Freightliner had no obligation to reveal its hand during the first deposition, and this happens very frequently. So once the – To do that at your risk, I mean – Yes. It's a gamble. It's a gamble. And I don't think it was intentional here. They didn't know this causation issue was going to be at the core of the case. But the bottom line is, these statements were admissible. The district judge originally said she thought that they were inconsistent and that they don't need to be diametrically opposed, and then changed, after the evidence had all come in, reverse course. And it was extremely prejudicial, especially when coupled with the refusal to give the causation instruction, again, which the Sewell case requires, that says if – even if the vehicle was defective, if the same injuries would have been sustained, you must find for the defendant. Counsel, let me ask you about this. In the declaration that Freightliner's counsel gave, he stated that during the December 2003 deposition, no attorney asked Mr. Harvey or whether Mr. Tillman made any attempt to climb out of the skylight through use of his feet or otherwise. Doesn't that preclude any argument that there was inconsistent testimony if no one asked him about that? I don't think so, Your Honor. I think the questioning at the deposition was much more general. And Exhibit A, that Mr. Tillman – that Mr. Harville gave testimony that directly supported the plaintiff on that, is the plaintiff's own arguments to the jury. The judge allowed plaintiff's counsel to say that Mr. Harville's testimony shows that he could use his legs and that he was able to get out and that he was fine and that, again, I keep going back to this quote, but that his legs were not injured. And so I think, Your Honor, the fact that questions weren't asked – and I think in part of that declaration he said Freightliner's lawyers did not ask questions earlier on. But either way, Your Honor, I think that it's clear from the – No, he said no attorney. And I think earlier on he says – as to one of the other questions, he says Freightliner's attorney. But I take your point, Your Honor, and my point is that that's not at all – that doesn't tell us what Mr. Harville actually testified to. What he testified to is that he saw him standing there. We would have walked out together. He said – Mr. Tillman said, I'm all right. And then the plaintiff's lawyers were allowed to then use that as the launching pad to argue literally over and over. He was uninjured. He was fine. The only problem was the width of the skylight and the lack of a sleeper door. And, again, even if we would have failed to persuade the jury, there was the right to cross-examine or impeach that witness using these inconsistent statements. What was the reason the district court – was the only reason the district court said that this evidence was not admissible was because it was not inconsistent or that was solely – Yes, that was the sole reason, Your Honor, not inconsistent enough. And we think that's legal error, not – Not consistent – not inconsistent enough. Exactly. And I think – and I think that is an erroneous interpretation. You've got four minutes left. Thank you, Your Honor. I think I will – I will then just move briefly to the excessiveness question. I think – this is a case where I think the indicia are that the 7.7 million in non-economic damages were not challenged in the other pieces of the award on excessiveness grounds is excessive. And there are several indicia. First, the California Court of Appeals decision in the Buell-Wilson v. Ford case directly rejects the trial court's decision, the district court's decision, that comparative analysis was not appropriate. And here, this award is larger than any award in a closely – in a remotely comparable case in the history of California that's been affirmed on appeal. And that, we think, is one blinking red light that says this award is excessive and should be at least reduced or grounds for a new trial. Secondly, it's four times bigger than the plaintiff's lawyer asked for. And the plaintiff's lawyer, on page 416 of the excerpts of record, it's the closing argument. He declared, we're asking for 2 million. And he said, this is a big number. We think that fairly represents the depth of this relationship. And the jury awarded nearly four times that amount. And the Buell-Wilson case, we submitted a 28-J letter on the Buell-Wilson case, says that that's another significant indicia of excessiveness. And finally, this is the kind of case, I think, where jurors could be expected to feel deep sympathy and to be swept away by the sadness of the circumstance. A woman lost her husband. The love letters were introduced into evidence. It's a very sad situation. And so I think under those circumstances, this is the kind of case where passion or prejudice led to this verdict, which was nearly four times what was requested. And I'll reserve the rest of my time. We're going to take a short break. I've got to make a phone call to a doctor's office. Okay. Thank you, Your Honor. All rise. All rise. All right. All right. Please, the Court, and good afternoon. My name is Paul Reingold. I'm a partner in the firm that tried the case. Mr. Simka Schonfeld is an associate in our firm who did the brief, and Brian Panish is our California counsel. We ask that this Court affirm this verdict, largely based on the reasoning that you'll see in Judge Phillips's decision and the points we made in the case. To talk about liability first, it's not true that if we fail on one of the two theories the jury found for us on, we fail on the other. The jury found for us both on negligence, or Vernet Chilman, excuse me, both on negligence and on violation of the strict liability branch that deals with consumer expectation. Interestingly, I did not hear Mr. Boutros attack our negligence case, except to say that if either fails, both fail, citing the Petit case. The Petit case we pointed out in our brief does not hold that. It does not state that if you fail in one, you fail in the other. And, in fact, the Bradshaw case, which you cite in our brief, a California case, makes it very clear that if you have two theories of liability and the proof supports either one, that's sufficient. And there's been no attack on our negligence case. There's been no briefing by the defendant that we failed to prove a negligence case. No oral argument. And, in fact, our expert below testified that there was a departure on the part of the freightliner company in failing to use adequate and reasonable conduct in designing this vehicle, this tractor, so that it would be a safe means of egress. So, in a sense, we won. But I don't certainly mind addressing the consumer expectation test, Your Honor, because I feel that was properly submitted to the jury and properly decided by them. Their attack that they put on the oral part of the argument today, as far as the failure to meet the requirements of the ordinary consumer expectation test, relates to the sole decision, which we agree is good law, binding law, that if there's something about the defect that ordinary consumer could not understand, then, of course, it's not a case that should go to the jury on this very liberal theory of consumer expectations. The cases which have said it doesn't go to the jury are referred to as esoteric or arcane parts of a car or a truck, such as how the airbags work. I don't know what triggers airbags. The ordinary consumer doesn't. And the question is, in a case here where the issue before this jury was, should there have been other safe means of egress? Does that fall within a consumer or trucker's ordinary expectation to have some, when he has a fire in the front of his cab, to have some means to get out at the back of his cab or the top of his cab? I think that's something that a jury can understand. And, in fact, the Judge Phillips, whose decision I'm sure you've read or commend you to read again, said that this was not a case of technical or mechanical detail, didn't raise any complicated design, wasn't esoteric. It was just a question whether the truck driver had an opportunity safely to get out of his car. So not beyond the can of a jury to understand that case. I would now propose to turn to the question of Harville, but I'll be happy to answer any questions. With regard to Harville and his deposition, it's quite true as brought out that he was deposed. The defendants cross-examined him. The cross-examination was used extensively during the trial. There's many a times I, as a trial lawyer, when I see a deposition I took or an associate took, and I'm reading a deposition, I say, gee, I should have asked that. Well, that's what a deposition's about. That's your chance to take it. The man unfortunately became ill or he could have died. I mean, you're bound by the deposition they took. The statement that they wanted to use for impeachment, and we agree, of course, that if it was a contradiction, it could have been used, was, first of all, not a statement by Mr. Harville. It makes it sound like he signed a statement when the investigator went to him. The investigator spoke with this man and put down what he said the investigator heard Mr. Harville say. And Judge Phillips, in the record that's on appeal in ER 270, said at great length, she said, each and every section of Mr. Harville's deposition, and she compared it to this purported statement by him, which was filtered through someone else. She said there are no inconsistencies that would make this an impeachment. And she deals with the very points that Mr. Boutros, his appellate lawyer, and I, his appellate lawyer, have seen when we read through the record. And those are things like in the deposition he said the man was bending. And, of course, he's going to have to bend to get out of a cab that's turned over on the side, and he's trying to get out of this 14-inch window. And they was asked, could he see his legs? He said, no, the smoke was there. Then he comes on with a statement later on, again, filtered through an investigator, that says they couldn't see his legs. It's not contradictory. In addition, I think the court picked up with the point that to the extent some of these things were contradictory, they were labeled themselves as something new. They wanted to go back and take a deposition on new and different points, so it couldn't be possibly contradictory. Counsel, what about the statement that Mr. Harville said that Mr. Tillman was fine and then later said? And then is that being inconsistent with him? Well, neither I nor Judge Phillips felt it was inconsistent, Your Honor. That's all I can say. I mean, fine is obviously a very generalized term. The jury could determine from all the testimony what this man's condition was in. A fine is the man was shook up. He was in an accident. He couldn't get out of a car. Mr. Harville broke the window and tried to pull him out of this narrow space. What about Mr. Harville's statement that he expected them to walk up the hill together? Wouldn't that imply a use of legs? Well, yeah, but it's more like, to me, it's like bravado. I mean, he could have carried the man up to get him away from the fire. But he said walk up the hill together. He didn't say carry him. Well, he did say that, Your Honor. Why wouldn't that be inconsistent? It's not inconsistent because I think it's just kind of praising himself, really, just saying that we could have gotten out of this. I tried to save the man and I couldn't. That is one of the alleged inconsistencies that are discussed by us in our brief, and I don't think that Judge Phillips was wrong in exercising her discretion when she said I read all this, and not only read it, but what I'm reading to you from Judge Rawlinson is only a small part of the entire record where they went back and forth on this, and she finally took it home. The other point I'd respond to what you're saying, Your Honor, is that there was more than an issue of contradictoriness because Judge Phillips said, continuing on, I'm very troubled by this proffer, that is the statement that's filtered through the investigator, that there's a very critical misuse, and she was critical of quite a large part of this statement. Mr. Tillman, they tried to say Mr. Tillman didn't climb out of the exit as the man did in the video. Evidently, they had shown Mr. Tillman a video that Freightliner took, and then they were asking him to compare Mr. Tillman's condition to that of some people who were, of course, taking their time to try and get out of it. So the judge also had her doubts about the trustworthiness of it. So I feel to say that this case should be reversed would be overruling a highly discretionary decision by a judge who sat there and heard both the testimony and read this proposed proffer. Thank you. Third, Your Honors, I'd like to turn to the issue of the size of the verdict, which we say was large but not excessive, and would ask that you affirm it completely. The Buell-Wilson case, which came down after the briefing, is very informative. It's informative, first of all, because it uses the strongest possible language that the court should do everything it can to uphold a verdict if it can find it. And Judge Phillips herself put forward that point of view as well. Counsel, what's your response to opposing counsel's argument that this is over three times larger, four times larger than you even requested? Well, my first response is, if you mind a little humor, that I'm mad at my partner for asking so little. But he's a good trial lawyer, and I've tried cases, and I've had juries bring in both more and less than I asked. And I do think that we have to give some acknowledgment to Buell-Wilson, which is evidently the first time a court formally looked at and compared a lawyer's request to what the jury did. So I can't say it's irrelevant because the Buell-Wilson case says it's relevant. In that instance, it was 13 times, and the court, when you read that decision, taking the jury bringing in 13 times and other surrounding facts did feel it was a factor. This is between three and four times the difference between $2 million and $7.7 million, Judge. And I think that's well within a range of what a jury can do. I thought it was $8 million. It was $7.7 and then some dollars. But it's closer to four than three. You know, usually when you charge a jury, you say what a lawyer says to you in open air summation, the amount they ask, it's just argument. And that's just argument. So maybe that is one indicia that you would look at, and, of course, under Buell-Wilson you should look at. But it's not seeing the totality of a defendant. A defendant might say to try and hold a jury verdict down, well, don't bring in over $100,000 or something, trying to hold the jury down. And the jury brings in $50,000. Well, I don't think the defendant has set a floor for $100,000 that it's automatically raised up because that's what he mentioned. And so in the same way, I don't believe a plaintiff's argument to a jury constitutes a ceiling. It's advocacy. Well, that coupled with the history of awards in California, that's, I mean, this isn't in a vacuum. It's also looked at against the backdrop of what comparable awards have been seen in California. Well, we did compare awards, Your Honor, and they're brief. And by using the unit measurement, which is one way of looking at it. Also looking at the total verdict. Total verdict, all right. Here's the total verdict. When you compare two cases, which now under Buell, that Judge Phillips didn't have the benefit of that change of law, it's certainly appropriate to look at other cases. And other verdicts that we found and discussed are smaller, but they're for older people. And obviously, if you're going to give an award for a lifetime, in this instance, life expectancy was 43 years, then you're going to have to measure how much is it for 43 years as compared to how much is it for a person who's going to live 10 or 20 years. And on that basis... Was the life expectancy argument, is that how the argument was made to the jury regarding the amount of damages? No. I didn't think so. No, no. There was no unit. If I can call that unit argument, there was no such argument made. They'd say, what would be a fair sum for Renee Tillman, who suffered this devastating loss of her husband, over what period of time? No, that wasn't made. No, not made. That's not justification for the award, that it was going to have to last for a substantial period of time as opposed to for an older person. Well, don't you think, Judge Rollins, that it is relevant to if you had a verdict that was half as large in another case, that that person only had half as long to live? If that wasn't the basis for the award, no. Yes, it was, because the jury was informed that there was a 43-year life expectancy. And so they were aware of the number of years that Mrs. Tillman, Renee Tillman, would be deprived of those 11 elements that you have in the California law here of love, care, compassion, sex. That's a variable, because you don't know how long she would be deprived. That's true. She could remarry. You know, there are a number of other factors that would be considered in that. So I don't think that was the basis. Well, that's not the law, though. I mean, yes, they could die, or he could have died of natural causes or anything else. But I thought you said it wasn't based on a life expectancy. Well, it's got to be, but not in a unit method. Okay. In the instructions to the jury, was the jury instructed to award damages based on a certain number of years that Mrs. Tillman would need? Not in so many words. What is the reason that you give the jury life expectancy in a conscious pain and suffering case or in any intangible non-economic one? It's as a method for them to take into consideration how long is the person going to be deprived of what they're entitled to? That's not a good measure, though, of how long somebody's going to be deprived, because that doesn't stay fixed. All right. I can see your argument. I'm not arguing. No, I'm sorry. I misspoke. I can see your reasoning. And the concept of these blinking lights that Mr. Boutros referred to, yes, evidently it is the biggest, but, yes, this was a tragedy. And I still go back to the number of years that Mrs. Tillman's deprived of this. And you've read Judge Phillips's post-trial decision that felt that she sat in her discase, a juror sat in her discase, and they were mightily impressed by Mrs. Tillman and Mr. Tillman. They had the love letters. We might think they're mushy, but they were love letters that passed between them. She said he was the man of his life. This case struck the jury and the judge on appeal on her post-trial decision as an extraordinary loss. I think anyone disputes that it was an extraordinary loss. The issue is whether or not it's consistent with prior awards that have been made under California law. Yes, I agree to that. And then the question is, how does this court or how do any of you here, even if we decide that something went wrong, and we're going to overturn what essentially nine people have said now, eight jurors, and then the judge who the Buell-Wilson case says comes along as a second line of analysis, and she affirmed this by saying that the loss to Renee Tillman was enormous, quote, unquote. How do you go about deciding to reduce it? And address that in two ways, if that is even in the offering. The first is that Buell-Wilson changed the law, that if there is a bias, passion, or prejudice, it should be reversed. Instead, it's now clear that it can be reduced. When Mr. Boutros gave the court the Buell-Wilson decision, he didn't give you a subsequent decision, which the court had modifying its opinion several months later. And I might just give you ñ I'll pass it up if I could do that. But in the subsequent decision, it says that the court asserts we required as a matter of law to grant a new trial on all issues if the verdict was a product of passion or prejudice. However, case authority demonstrates it is appropriate to issue a remitter under such circumstances. Now, we say firmly there should not be a remitter, that given the facts of this case and the discretion of the trial judge below in approving it, you should not do it. We don't see the size aside, we don't see any addition of any blinking lights that Mr. Boutros referred to. Where is there evidence of a passion or bias or prejudice other than the size? It's a huge indicator, though. Excuse me, Your Honor. That is a huge indicator, the size. Okay. I can't argue that it's not an indicator. I don't agree huge. So how do you go about if you do a remitter? As a unit, we worked out that the jury verdict, dividing the life expectancy into the verdict came out approximately $175,000 a year. We found some cases where if you use this method, which Your Honor is not sure should be used, it's close to $150,000 if you start dividing how many years the person is going to be deprived of these 11 items. So you could use that or use some method of reducing it. We don't think you should, but I submit if you should, it shouldn't be a new trial, and it should be at most a relatively minor reduction of the jury's verdict. And other than that, we would ask that you certainly affirm on liability and the absence of any discretionary error by the judge in refusing to admit evidence. Thank you. Thank you. Let me begin with that last point. There's no support that has been cited or that I'm aware of in California law for using that sort of per annum calculation on future non-economic damages. It was sort of a controversial principle even for economic damages. But there's absolutely no support for using that life expectancy in that way, and we believe the Court should reject it. Well, I think, you know, but it's certainly a commonsensical way to look at it. Your Honor, I think for the reasons that Judge Rawlinson was alluding to, it's a different circumstance. It's a difficult circumstance, no doubt. But that framework, and I think this is why the California courts have never adopted it, just doesn't fit when you're into this very sensitive area of this type of loss. And so I don't think, I respectfully don't think that it works. Well, I mean, wasn't there some testimony about how she felt about getting married in the future by just imagining that? Wasn't there something said about that? I think there was very little testimony on her actual feelings, that it was the love of her life. And it was, as I recall, the testimony was fairly contained. Yeah, all the letters and all that. Yes. I'd just like to go back to the inconsistent statements. Two things. In Plaintiff's Brief on page 5, 4 and 5, they claim that Mr. Harville testified repeatedly that Mr. Tillman was unhurt as a result of the accident. That was there capturing all of the, whether he could use his legs, whether he could get out in his own power. And again, I think the testimony that the investigator would have given based on Mr. Harville's later statements, that he didn't know if Mr. Harville could use his legs. He couldn't see his legs. He didn't know whether Mr. Harville could have gotten out under his own power, would have been extraordinarily helpful in impeaching that testimony. And the other aspect of the inconsistencies that I didn't really focus on, the Plaintiff's Counsel conceded the inconsistency. On page 260 of the Excerpt of the Record, Counsel for Plaintiff said, if there's a statement that Michael Harville said he didn't know if Timmy Wayne Tillman was stuck, there are actually statements where he says he was stuck. We will not, if this testimony is going to be allowed, this specific statement, we're not going to contest because it was diametrically opposed. Harville said he was kind of stuck in his stomach. He was stuck. This is on ER 25. And then to the investigator he said he didn't know if he was stuck. That was the crucial, if he wasn't stuck, he would have been able to get out. So it would have been crucial evidence. And the concession is on Excerpt of Record, page 260. And so the final point I'd like to just wrap up with is that we did challenge the negligence. Why would that have been crucial ever? Because, Your Honor, the theory of the plaintiff's case was that when Mr. Harville ran down and bashed out the skylight and was trying to pull Mr. Tillman through, Harville's testimony was he got stuck. But then the investigator interviewed Mr. Harville and he said he didn't know whether he got stuck. And if we had been able to show that Harville's testimony was that he didn't know whether Mr. Harville had gotten stuck, Tillman had gotten stuck, that would have been crucial because then that would have supported the theory that he was already injured and that he'd been injured in the accident and it was the accident itself that caused his death, not a defect in the vehicle. So it would have been absolutely crucial and there's more than a reasonable probability that would have changed the result. That was the heart of the case and the crucial evidence, impeachment evidence. Well, he was able to get part of his body up. Mr. Harville was pulling him. Yeah, pulling him. And our theory was Mr. Tillman's legs were injured and they'd already been injured and that was why he couldn't have just walked out of the vehicle. Our theory was there was a way for him to get out, the skylight. If he hadn't already been injured, he could have walked out. Their theory was he was fine, he was all right, as he supposedly told Mr. Harville. So you have a theory that his legs were broken? That he'd been incapacitated in the accident and that's why he couldn't move. I mentioned the videotapes that show huge men able to just get up and walk right out that skylight. It was a demonstrative exhibit so there's no fire. But our theory was that if his legs had not been injured, he would have been able to just walk right out. And so that was the theory at trial and the crucial evidence against us, and I can't emphasize how much Mr. Harville's testimony was emphasized. He was viewed as the voice of truth. He wasn't in the courtroom. If he wasn't stuck, why couldn't they pull him out? Our point exactly. It was that, number one, that he was so heavy and the fire was raging, and he was, I think, weighed 250 or 270 pounds. Mr. Harville was about 70 pounds lighter and he was struggling to drag Mr. Tillman out of the vehicle. And that's why, he just couldn't muster the strength. If he wasn't stuck, that's why he couldn't get him out. It wasn't because he was stuck. So I think it would have gone right to the heart of the case and would have been very persuasive. It would have changed the entire case, but it was excluded. There was no reason to exclude the evidence. And I think here the benefit of the doubt should have gone to allow Freightliner to impeach someone who wasn't there, whose testimony was being used as the crucial evidence in the case. So for those reasons, we respectfully... Well, you took his deposition. His deposition was, yes. Well, plaintiffs deposed him. This was a discovery deposition, as I recall. This was the plaintiffs taking a discovery deposition. Yeah, but you're there. You can cross-examine. You can get all the information you want. Your Honor, in a discovery deposition, the party who's not deposing the witness often does not use that as the opportunity to cross-examine the witness. They want to wait and gather their evidence and cross-examine the witness at trial. And so here... Again, that's a tactical decision. You could have asked. Yeah, I mean, I've never experienced that. I was involved in a lot of depositions. You're right. It's a very common... Take it. Well, it's a very common practice, but even in that circumstance, if I gather additional evidence after the deposition, I'm allowed to use it under Rule 806. I'm not barred because I didn't... But the district court has the discretion to tell you that you haven't met the criterion for using that. And that's an abuse of discretion standard review that, you know, it's pretty high. I think, Your Honor, this Court's cases, the Supreme Court's cases, say that if a district judge makes an error of law, that's automatically an abuse of discretion. And I think the interpretation of inconsistency here, he said Mr. Tillman was stuck. He then said he didn't know if he was stuck. What's the error of law? That's an interpretation. I think it's an error of law because it's too strict a standard of inconsistency, Your Honor. That that standard in trial courts every day, that is not the standard that applies a much more liberal standard of inconsistency. And it would have been crucial evidence. And going back to your question, Your Honor, at the time of the deposition, Plaintiff's theory of... I still don't understand what you're saying. How could that be a question of law? Well, it's a question of law in the sense of how strictly do we interpret the word inconsistent? Does it have to be completely inconsistent? Or does it have to be just something that would be impeaching? Inconsistent to a degree that would undermine the testimony. That's for the trial judge to decide. I think the legal standard, Your Honor, is... That's not a question of law. I think it is, Your Honor. I think the question of the standard of inconsistency is a question of law. And I think that the district judge applied too lenient. A case that says that. I have cases that we've cited, Your Honor, that talk about the standard that say it is not diametrically opposed. And I think that the district judge here applied that standard. That holding that you had to have it just be absolutely clear, you know, one versus the other. And I'm confident that the statements of the investigator would have been devastating cross-examination if this person had been in trial. And that's the test as to whether it comes in under Rule 8 of 6. You know something, a lot of these inconsistent statements, you know, most of the time don't get you very far. I don't, you know. I don't think juries pay that much attention to inconsistent statements. What color was the car? Oh, it was black. Turns out it's green. Your Honor. The case is not going to hinge on that. I think here it would have hinged on it. And I think it would have changed the result. I don't have to prove at this point that it would have changed the result, just that there's a reasonable probability. I think it would have, Your Honor.  That was the crucial issue in the case. If I had him on the stand and I said, Mr. Harville, do you know whether he was stuck? And he said no, I would have won the case. So it's a crucial issue. And again, because the crucial issue is whether he was stuck. Mr. Harville was the only witness who gave testimony that he was stuck. If I were able to say, you don't know he was stuck, the only piece of evidence that was introduced on that point would have been involved. Well, he would know he was stuck, but he believed he was stuck. So that's the difference between whether it's inconsistent or whether it's just a matter of degree. Your Honor, I don't think there was any evidence that he said he believed he was stuck. He said he was stuck. He said at one point, I think he was stuck, and then he said he was stuck. If I had testimony that shook that up, that testimony up, it would have been extremely helpful. That's different saying, do you know he was stuck? Do you think he was stuck? Do you believe he was stuck? How stuck was he? I mean, that's all a matter of degree. But I wouldn't even have had to ask those questions, Your Honor, if the guy admitted, I don't know if he was stuck. So it would have been extremely helpful testimony. You didn't ask that question when you had a chance. Well, at the time, that was not the crucial issue in the case. You never know what the crucial issue is going to be. That's true. You never know. That's true. So that's why you cover the ground in deposition, because you never know. A lawsuit is a living thing. It absolutely is, Your Honor. That's why if a party gathers evidence after a deposition that's devastating to the other side's case, the party is allowed to use it during trial. The fact that I gather evidence, again, I don't think that the deposition issue is connected. You just said before that, well, the tactic is you don't ask too many questions. Then you come back and you take another deposition. No, Your Honor. I didn't mean that. It's not that you go back and take it. If you come back at trial and cross-examine, don't show your hand. At the trial. And you gather your evidence in another way. It's perfectly appropriate. And at the time. It's appropriate, but it's chancy. Sometimes it's chancy. The witness dies. Things happen. So it's a chance you take when you try to wait for trial. You never know. I think, Your Honor. Well, is that what you were going to do? You were going to get information from other people and then wait for trial and then spring it on them? Well, just to go back, I wanted to answer Judge Sandoval's question. Because at the time of the deposition, Freightliner didn't know that this was going to be an important issue in the case. The issue of the escape hatches and the escape means and him getting stuck, this came out in more of a narrative from Mr. Harville. It only became crucial as the case – Freightliner was the one being sandbagged. Well, when there's a discovery deposition, nothing's been solidified. So everything's on the table. So that's the point. That's the time when you explore everything. If it's a discovery deposition. Your Honor, I don't think – I know that the plaintiffs did not cite one case that say that if a party obtains inconsistent statements from a witness that outside the scope of a deposition that was taken, that that precludes the statements from being used. We're not saying they preclude it, but we're saying abuse of discretion. We're looking at whether or not there was abuse of discretion. All of this comes into consideration. I don't think that was the court's analysis. It wasn't that you had your shot, you didn't take it. It was that these statements aren't significantly inconsistent. That's a legal error, and it's an abuse of discretion as well. So with that – He said in the deposition that he was stuck, right? Yes. And you think that he wasn't stuck, but he broke his legs. That's why he couldn't get out. Yes, or his legs had already been consumed by the fire. Yeah. And so was there anything left of him after the fire? The fire was so fierce that it was impossible to do an examination to determine if his legs had been injured or broken. And so this was the only evidence that the company had. You know, you get one of these crash text experts. They go look inside the cab of this, and they take the impact of all this and things that happen. And we know that it's not uncommon to suffer kneecap injuries or injuries to your lower legs or your femur or whatever. You could have gotten an expert that would have rendered an opinion. I agree, Your Honor. It is common. I think that's the most likely scenario here. But there was no way – No, I mean, the likely scenario is that he couldn't get the guy through. There really was no basis based on the accident seen after the fire to make that kind of determination, Your Honor. And so this was crucial testimony. And I think when you combine the exclusion of this testimony with the exclusion or the refusal to give the causation instruction, which is required by California law under the Sewell case, combined with the use of the consumer expectations, which should not have been applied here, and then you have the damage award, which is, we believe, excessive. We request that the court either grant judgment or, if not that, a new trial pursuant to the correct legal principles and failing that, a remediator, a significant remediator, to bring this award in line with it. Could you quantify this, what you mean by significant remediator? Yes, Your Honor. I think in these circumstances, to be perfectly candid with the court, I would say – Always be perfectly. That's what I – I am, Your Honor. I think that given that plaintiffs asked for $2 million, given that the range that we identified puts these sorts of awards in the $600,000 to $2 million range, that that $2 million amount would be a much more appropriate award and would be an area that the court could reduce the award to if the court does not accept my other arguments. Well, I've been involved in cases where attorneys get up and they put these figures on the board and they're very gutsy and they say, this is the damage award, not a penny more or a penny less. Jury comes back and gives them a lot more money. You know, they figure, well, the guy's got a dumb lawyer. I won't comment on that, Your Honor. But here, the counsel said it was a big number. Well, look at him. He looks like he's just off the farm. I'm confident in his capabilities. Poor truck driver. Can't he do any better? Here, Your Honor, counsel said it was a big number, told the jury it was a big number, that it was fair compensation. And this is an area where it's very difficult to come up with a number, and so it's open-ended. So I think it's appropriate for the court to look at the amount that was requested. Doesn't that make the point? You just said it's difficult. So the jury does that. It's weighing things and comes to its decision. I think that my point is, Your Honor, that that means that judicial scrutiny needs to look to objective benchmarks, like the request to the jury, like the comparable awards, like the fact that this is a case where sympathy and compassion might produce an award that's excessive. And it's unlike economic damages, where there's a specific request, you can look at the numbers. Here, we need to look at these other objective benchmarks. All of them point towards this being an excessive award, and a $2 million award would still be one of the biggest non-economic damage awards in California history in this type of case or any other kind of case. So we think that would, at a minimum, we would request the court remit the award to that amount or less. Thank you very much. All right. I guess that's it, huh? I think we gave you an extra 15 minutes, 16 minutes, too. I wasn't paying attention to the numbers. Okay. Well, this court adjourns.
judges: Pregerson, Rawlinson, Sandoval